UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD P. PARDUCCI,<br><br>Plaintiff,<br><br>v.<br><br>OVERLAND SOLUTIONS, INC., et al.,<br><br>Defendants. | Case No. 18-cv-07162-WHO<br><br>**ORDER DENYING MOTIONS TO DISMISS**<br><br>Re: Dkt. Nos. 62, 64 |

**INTRODUCTION**

Plaintiff Richard P. Parducci ("Parducci") sues defendants AMCO Insurance Company ("AMCO") and Overland Solutions, Inc. ("Overland") for allegedly engaging in a scheme to overcharge customers of homeowners' insurance by intentionally overestimating the replacement costs of homes. I previously dismissed his original complaint because he did not sufficiently plead fraud with requisite particularity. Order Granting Motions to Dismiss and Denying Motion to Strike ("Order") [Dkt. No. 56]. He fixed the deficiencies and now sufficiently pleads fraud in his Amended Complaint, which forms the basis for his intentional misrepresentation, negligent misrepresentation, elder abuse, and fraudulent business practices claims. Amended Complaint ("Am. Compl.") [Dkt. No. 59]. Parducci also sufficiently alleges a breach of implied covenant of good faith and fair dealing against AMCO because he is not required to bring a breach of contract claim or allege withholding of benefits in order to move forward with this claim. AMCO's and Overland's motions to dismiss are DENIED.

**BACKGROUND**

**I.      PROCEDURAL BACKGROUND**

On November 27, 2018, Parducci filed his original complaint in his capacity as conservator

for and on behalf of Margarett L. Parducci, and as Trustee of the John A. Parducci and Margarett L. Parducci Survivor's Trust. Complaint [Dkt. No. 1]. On July 17, 2019, I dismissed his complaint because he failed to allege valid claims against AMCO and Overland for (i) intentional misrepresentation, (ii) negligent misrepresentation, (iii) unlawful, unfair, and fraudulent business practices under Cal. Bus. & Prof. § 17200, et seq. ("UCL"), and (iv) financial elder abuse. Order at 10. He also failed to allege claims against AMCO for (v) breach of the implied covenant of good faith and fair dealing and (vi) breach of contract. *Id.*

On August 16, 2019, Parducci filed an Amended Complaint bringing the same claims, except for breach of contract. *See* Am. Compl. Both AMCO and Overland move to dismiss the Amended Complaint. AMCO Motion to Dismiss ("AMCO MTD") [Dkt. No. 62]; Overland Motion to Dismiss ("Overland MTD") [Dkt. No. 64]. I heard oral argument on November 20, 2019.

## II. FACTUAL BACKGROUND

Parducci is the grandson of Margarett Parducci and the late John. A Parducci (the "Senior Parduccis"). Am. Compl. at ¶ 1. During the relevant time period, the Senior Parduccis were both over the age of 65 and resided in a home located in Ukiah, California. *Id.* at ¶¶ 7–8. AMCO insured the Parducci residence under a homeowners' policy since at least 2008. *Id.* ¶¶ 8–9. Parducci contends that for at least seven of those years, the home was over-insured as a result of inflated replacement values allegedly determined by defendants. *Id.* ¶ 12. As a result, the Senior Parduccis were required to pay excessive premiums on coverage limits that the family "would never be able to collect if there had been a loss." *Id.*

On January 4, 2016, pursuant to his duties and responsibilities as trustee, Parducci requested from the Senior Parduccis' broker and AMCO's agent, Mark Davis Insurance Agency ("MDI"), "a seven-year history of the amount of insurance that was being carried on the Parduccis' residence, an accounting of the premiums for the coverage of the structure, and an explanation of how the replacement cost had been determined for each year that the property has been insured." Am. Compl. ¶ 10. He initially received a copy of the 2013 appraisal report performed by Castle Inspection Service. After he requested that MDI provide a complete copy of

the insurance file in May 2017, MDI responded, in part:

> professional inspections and analyses of the Parducci property were performed in 2010 (survey only) and 2013 (Castle Inspection Service), at the insurer's expense. The 2013 report by Castle (an industry leader) concluded that the replacement cost of the Parducci property was [$]1,528,000. Nationwide requested coverage of [$]1,589,000, and that was the amount of coverage provided. I attach a copy of the 2010 and 2013 reports.

*Id.* ¶ 11. MDI also provided eleven declaration pages for various years and some limited correspondence between MDI and AMCO; it failed to provide the original policy application. *Id.*

Parducci alleges that misrepresentations regarding the home's replacement value were made "on at least two appraisal reports issued in 2010 and 2013 by Overland and prepared at the request of AMCO." Am. Compl. ¶ 21. He contends that "AMCO used the Overland appraisal report dated November 22, 2010 to justify the replacement value of $1,525,000," which it had previously set in or about October 18, 2010. *Id.* ¶ 15. Exhibit 1 to the Amended Complaint is the November 22, 2010 report. *See* Amended Compl., Ex. 1 ("2010 Report"). He asserts that the 2010 Report was "performed by Overland's agent or employee, Bruce Hotaling" and the "insurer identified on Overland's inspection report is Allied Insurance Company (AMCO's parent)." Am. Compl. ¶ 14; 2010 Report at 2.[1]

In or around October 18, 2012, Parducci contends that AMCO increased the dwelling coverage limit to $1,589,600. Am. Compl. ¶ 16. Subsequently on July 19, 20193, AMCO, through its agent or employee Laura O. Volpe, issued a request to Overland to perform an appraisal of the Parduccis' home. *Id.* Ms. Volpe allegedly informed Overland that the replacement coverage amount for the Parduccis' home should be $1,589,600, which is documented in the 2013 report attached to the Amended Complaint. *Id.*; *see* Am. Compl., Ex. 2 ("2013 Report"). The coverage limits listed in the October 18, 2012 declaration ($1,589,600) matched the 2013 report. Am. Compl. ¶ 16. Parducci alleges that AMCO justified the inflated dwelling coverage limits that it had already placed on the Parduccis' residence with the 2013 Report performed by Overland, through its agent or employee David McMills. *Id.*

---

[1] Page number references to the 2010 and 2013 Reports are to the ECF docketed page numbers.

3

The replacement coverage amount continued to increase with each renewal notice and declaration pages as follows:

- October 18, 2013: $1,634,600.
- October 18, 2014: $1,693,000.
- October 18, 2015: $1,734,000.
- October 18, 2016: $1,766,900.
- October 18, 2017: $1,809,700.

*Id.* ¶ 17.

In August 2016, Parducci moved the homeowners' policy to a new AMCO agent, identified as the Lincoln-Leavitt Agency, "in the hopes of obtaining an accurate replacement valuation." Am. Compl. ¶ 19. Using its in-house computer estimator, Lincoln-Leavitt Agency estimated that the replacement value of the residence should be between $855,000 to $925,000, depending on the value of certain fixtures. *Id.* In February 2017, in response to Lincoln-Leavitt Agency's estimate, Parducci solicited the opinion of various contractors and architects in the area, who estimated that the residence could be replaced at that time for between $140 and $170 per square foot, bringing the total replacement cost for the approximately 6,000 square foot home to between $840,000 and $1,020,000. *Id.*

In April 2017, Parducci used these estimates to request that AMCO reduce the amount of coverage to reflect the lowered home replacement cost. Am. Compl. ¶ 20. The Lincoln-Leavitt Agency forwarded his request for reduction to AMCO. *Id.* AMCO refused to lower the replacement cost, claiming that the higher replacement cost reflected in the policy was correct. *Id.* His first request to lower the coverage was refused between August 2016 and February 2017 and his second request was refused in or about April 2017. Am. Compl. ¶ 21. He does not know the manner in which the Lincoln-Leavitt Agency forwarded his requests to reduce coverage to AMCO, but alleges that this information and the specific dates should be obtainable in discovery. *Id.* He also does not know the name of the individual or individuals at AMCO who refused his requests, and seeks discovery on that as well. *Id.*

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss if a claim fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the claimant must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a claim must be supported by facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

Under Federal Rule of Civil Procedure 9(b), a party must "state with particularity the circumstances constituting fraud or mistake," including "the who, what, when, where, and how of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks omitted). However, "Rule 9(b) requires only that the circumstances of fraud be stated with particularity; other facts may be pleaded generally, or in accordance with Rule 8." *United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 992 (9th Cir. 2011). In deciding a motion to dismiss for failure to state a claim, the court accepts all of the factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). But the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

**DISCUSSION**

**I. INTENTIONAL MISREPRESENTATION, NEGLIGENT MISREPRESENTATION AND ELDER ABUSE CLAIMS**

Federal Rule of Civil Procedure 9(b) requires that Parducci's causes of action for intentional misrepresentation, negligent misrepresentation, and elder abuse be pleaded with specificity because each claim sounds in fraud. Before discussing whether Parducci's Amended

Complaint satisfies Rule 9(b), I address the argument of both AMCO and Overland that Parducci failed to allege misrepresentation because the exhibits attached to his Amended Complaint, the 2010 and 2013 Reports, directly contradict his allegation that AMCO made misrepresentations as part of an alleged "scheme" to over insure the Parducci home. AMCO MTD 5–7; Overland MTD 5–6

### A. Contradictions by Exhibits to Amended Complaint

#### 1. 2010 Report

Parducci alleges that AMCO placed dwelling coverage limits of $1,525,000 on the Senior Parduccis' residence in October 2010, and subsequently in November 2010 "issued a request to Overland to perform an appraisal" and informed Overland "that the replacement coverage amount . . . should be $1,525,000." Am. Compl. ¶ 14. He alleges the AMCO "set the coverage limits of $1,525,000 before the 2010 report had even been prepared." *Id.* He asserts that "AMCO knew that Overland . . . would rely upon the replacement coverage amount suggested by [it] to set the appraisal value in its report instead of performing an independent appraisal and determining the true value of the Parduccis' home." *Id.* The 2010 Report was "performed by Overland's agent or employee, Bruce Hotaling" and the "insurer identified on Overland's inspection report is Allied Insurance Company (AMCO's parent)." *Id.*

AMCO argues that the 2010 Report was "simply a survey relating to wildfire risks" that "involved neither an appraisal of the property itself nor an assessment of the property's square footage." AMCO MTD 6. Regardless of the ultimate purpose of the 2010 Report, it clearly addresses the replacement cost under headings "Replacement Cost Info" and "Replacement Cost Details." 2010 Report at 3. The 2010 Report does not necessarily contradict with Parducci's claims; he alleges that the 2010 Report was used to support the misrepresented replacement value that AMCO had already set, as indicated in the 2010 renewal notice sent to the Senior Parduccis one month prior.

#### 2. 2013 Report

Parducci alleges that the 2013 Report also shows that the "replacement coverage amount was suggested, requested, and set exclusively by AMCO." Am. Compl. ¶ 16. He asserts that

6

AMCO set the coverage limit of $1,589,600 on the Parducci residence, as indicated in the October 18, 2012 renewal notice, and subsequently on June 19, 2013, requested Overland perform an appraisal, informing it that the "replacement coverage amount . . . should be $1,589,600." *Id.* The 2013 Report indicates that Laura O. Volpe, an agent or employee of AMCO, was the requestor, and David McMills, an agent or employee of Overland, was the inspector. *Id.* It follows, he argues, that AMCO set the appraisal value instead of performing an independent appraisal and determining the true value of the Parduccis' home. *Id.* Overland fulfilled this scheme because it "knew or should have known that AMCO would use the appraised value in [its] inspection report to set or justify the excessive or inflated dwelling coverage limits imposed on the Parduccis' residence." *Id.* With the 2013 Report performed by Overland, AMCO was able to justify the inflated dwelling coverage limits that it had already placed on the Parducci residence. *Id.* Parducci also alleges that the replacement coverage amount continued to increase with each renewal notice and declaration page. *Id.* ¶ 17.

AMCO argues that the 2013 Report not only contradicts Parducci's claims of a fraudulent scheme and related misrepresentation, but also confirms that there is no dispute as to the replacement value of the home. AMCO MTD 6. The 2013 Report states that the gross square footage of the Parduccis' residence is 8,885 square feet and that the replacement cost per square foot is $171.98. 2013 Report at 48. Parducci contends that the home is 6,000 square feet and that the replacement cost per square foot should be between $140 and $170 per square foot. Am. Compl. ¶ 19. Accordingly, AMCO contends that the 2013 Report shows that "the Parducci home was insured at nearly the exact rate at which [Parducci] alleges it should have been ($171 per square foot)." AMCO MTD 1. It suggests this case involves a dispute over square footage of the Parduccis' unique home in the undeveloped hills of Ukiah County. *Id.* If the square footage is equalized, the respective valuation calculations of the parties would be nearly equivalent, yielding an aggregate valuation differential of slightly more than 1%. *Id.*[2]

---

[2] The calculation is as follows: "[u]sing the high-end of [Parducci's] alleged range of replacement cost per square foot, and equalizing the aggregate square footage (at either the 2013 Report or at [Parducci's] square footage allegation) yields an aggregate valuation differential of slightly more

7

Parducci responds that AMCO tries to minimize the inflation by comparing the figure in the 2013 Report with a price range he gathered from other contractors in 2017. Oppo. AMCO MTD 13. By arguing the per square foot replacement cost in the 2013 Report ($171.98) was only $1.98 above the high-end of Parducci's suggested range of ($170), AMCO and Overland ignore the fact that the suggested range was based on 2017 estimates, not 2013 estimates. *Id.* The value of the home in 2013 should have been much less compared to his 2017 estimates. *Id.* at 14. Additionally, AMCO's annual declarations suggest that the value of the home rose $175,100 between October 2013 and October 2017. Am. Compl. ¶ 17.

Parducci's argument has merit. Taking inflation into account, the per square foot calculation in the 2013 Report should have been materially less than the estimate range he gathered in 2017. The 2010 and 2013 Reports attached to the Amended Complaint do not contradict his fraud claims.

### B. Allegations with Requisite Specificity

In order to adequately allege a claim sounding in fraud under Rule 9(b), a party must "state with particularity the circumstances constituting fraud or mistake," including "the who, what, when, where, and how of the misconduct charged." *Vess*, 317 F.3d at 1106 (internal quotation marks omitted). I found that Parducci's original complaint was deficient under Rule 9(b) because:

> Basic information is missing, such as who at Overland and AMCO made the specific misrepresentations, when and where the misrepresentations occurred, how Parducci discovered the falsity of the representations, on what basis he realized that AMCO and Overland's statements were misrepresentations, when and how his unidentified new agent forwarded his request to reduce coverage based on his lower replacement value estimates, who at AMCO refused his request, when that request was refused, and what the form of the refusal was.

Order at 10. I acknowledged that some of this information may be unknown to him but held that he "should allege what he can and explain why certain gaps will require discovery" since "[t]here is no justification to relax Rule 9(b)'s pleading standards when information is equally within his

---

than 1%. *i.e.*, ((($171.98 × 6,000 sq. ft.)-($170 × 6,000 sq. ft.)) ÷ ($170 × 6,000 sq. ft.) = 1.2%)." AMCO MTD 4.

8

1 possession as within AMCO's possession." *Id.* at 11.

2 Parducci argues that he answers these questions, particularly in Paragraph 21 of the Amended Complaint, and indicates where and why any information is lacking. Oppo. AMCO 7; Amended Compl. ¶ 21. AMCO and Overland argue that his answers to these questions are insufficient. I address each in turn.

### 1. Who at Overland and AMCO made the specific misrepresentations?

Parducci alleges that "[a]s indicated on Overland's [2013 Report], AMCO's agent, Laura O. Volpe, ordered the report on behalf of AMCO and thus, is alleged to be the one who advised Overland that the replacement coverage amount for the Parduccis' residence should be $1,589,600. Am. Compl. ¶ 21; *see* 2013 Report at 2, 7, 8, 48. Overland's agent or employee, David McMills, performed the appraisal to validate that amount. Am. Compl. ¶ 21. Parducci also contends that the 2010 Report "omits information as to who at AMCO ordered the report (this may be obtainable in written interrogatories to AMCO and Overland)" but notes that "the appraisal was conducted by Bruce Hotaling," an alleged agent or employee of Overland. *Id.*; *see* 2010 Report at 1, 3.

AMCO contends that Parducci's allegations are insufficient because he only states that Volpe made a representation to Overland but does not explain who at AMCO made a misrepresentation to him or the Senior Parduccis. AMCO MTD 8. Overland similarly points out that Parducci merely alleges that McMills performed the appraisal but fails to allege who at Overland made any sort of misrepresentations to the him or the Senior Parduccis. Overland MTD 7.

Parducci responds that "'who' misrepresented the replacement value coverage amount to [the Parduccis] is ultimately that person who authorized the inflated amount at the outset." Oppo. AMCO MTD 9. He alleges that the misrepresentations were made in the 2010 and 2013 Reports, and that he received copies of those reports years later after requesting them from AMCO's agent in January 2016 and May 2017. Am. Compl. ¶ 10–11, 14–16, 21. He argues that he has met the Rule 9(b) pleading standard because these reports show how AMCO validated its inflated replacement cost value and that Overland assisted in this alleged scheme by performing the

9

appraisals according to AMCO's pre-determined amounts. Similarly, the "'who' at Overland [that] misrepresented the replacement value coverage amount to [the Parduccis] is ultimately that person who determined the inflated amount at the outset." Oppo. Overland MTD at 11–12. He notes that I previously rejected Overland's attempt to argue that it was saved from liability for not making a direct misrepresentation to Parducci or the Senior Parduccis. Oppo. Overland MTD 12; *see* Order at 17–18 ("If such a scheme were in effect, Overland would know that its allegedly overinflated estimate would reach AMCO's customers, and that the customers would be influenced by Overland's estimated value of their home when purchasing AMCO's insurance policy.").

Parducci has sufficiently answered this question. As I explained in my previous order, Parducci is not required to allege direct representations in order to sufficiently allege a claim for fraud. Order at 17–18. Rather, he is required to allege who at AMCO and Overland made the specific misrepresentations that he claims were made as part of the alleged fraud or scheme; he has done that here.

### 2. When and where did the misrepresentations occur?

Parducci alleges that the misrepresentations "occurred on at least two appraisal reports issued in 2010 and 2013 by Overland and prepared at the request of AMCO." Am. Compl. ¶ 21. In both instances, AMCO pre-determined an amount, requested that Overland agents perform an appraisal to match that amount, and Overland agents complied. *Id.* ¶¶ 12, 15–16. He further contends that "the renewal notices and declaration pages mailed or delivered to the Parduccis each October 18 from 2010 to 2017" also show when and where the misrepresentations occurred. *Id.* ¶ 21; *see* AMCO Request for Judicial Notice, Exs. A–F [Dkt. No. 18-1] (copies of renewal notices).

AMCO argues that these allegations are directly contradicted by the exhibits attached to the Amended Complaint, but as discussed above, I find the 2010 and 2013 Reports are not necessarily contradicted. Regardless of the purpose of the 2010 Report, it still contains a section on "Replacement Cost Info," and comparing the figure in the 2013 Report with the estimates Parducci gathered in 2017 does not show a contradiction if inflation is taken into account.

Overland argues that Parducci does not "provide [] other facts including when or how the

10

'misrepresentations' were made to the Parduccis, and what misrepresentations the Parduccis allegedly relied on." Overland MTD 8. As discussed above in response to the first question, he is not required to allege a direct misrepresentation between AMCO/Overland and the Senior Parduccis. He is also not required to allege more facts as to reliance, because I previously found that "reliance is sufficiently pleaded as is" in the original complaint and found that AMCO's and Overland's arguments concerning reliance were without merit. Order at 9 n.3, 20. Parducci has sufficiently alleged that the misrepresentations occurred in at least 2010 and 2013, based on the two reports, and continually between 2010 and 2017 based on the renewal notices that inflated the replacement cost.

### 3. How did Parducci discover the falsity of the representations? On what basis did he realize that AMCO and Overland's statements were misrepresentations?

Parducci alleges that he discovered the falsity of the representations in August 2016, when he switched to a different AMCO agent, the Lincoln-Leavitt Agency, and obtained an alternate estimate from its in-house computer estimator. Am. Compl. ¶ 21. The Lincoln-Leavitt Agency "estimated that the replacement value of the Parducci residence should be between $855,000 and $925,000, depending on the value of certain fixtures." *Id.* In response to this estimate, in February 2017, he sought "the opinion of various contractors and architects in the area who confirmed that the Parducci residence could be replaced at that time for between $140 and $170 per square foot, bringing the total replacement cost for the approximately 6,000 square foot home to between $840,000 and $1,020,000." *Id.*

AMCO argues that it cannot be true that he learned of the misrepresentation when he obtained the estimate range from other contractors in February 2017 because the 2013 Report has nearly identical figures as to the contractor range when square footage is equalized. AMCO MTD 9. Again, as discussed above, the 2013 Report does not necessarily show identical figures given that 2013 and 2017 numbers can be different due to inflation.

Overland contends that Parducci has alleged "merely the same exact language as what was stated in the [original] Complaint, which the Court already held was insufficient." Overland MTD

11

8. Parducci responds that although the underlying allegation is the same—that he learned of the misrepresentation when he switched insurance agencies and performed his own independent investigation—the allegations are much more detailed than before. Oppo. Overland MTD 12–13. For example, he alleges that he made requests through his attorney on January 4, 2016 and May 8, 2017 to MDI for documentation regarding the policy, which is how he obtained the 2010 and 2013 reports that are attached to the Amended Complaint. Am. Compl. ¶¶ 10–11. He also adds when he moved the Parduccis' policies to a different AMCO agent, identifies the name of the new agency as Lincoln-Leavitt Agency, and provides a date for when he sought the advice of other contractors. *Id.* ¶ 19. He clarifies that the Lincoln-Leavitt Agency estimated the replacement value by utilizing an in-house computer estimator, which is what led him to seek the opinions of contractors and architects in the area in February 2017. *Id.*

In its reply, Overland asserts that these allegations are not sufficient because Parducci "fails to allege how it came about that he believed it was necessary to acquire a new agent or to ask for new estimates." Overland Reply In Support of Motion to Dismiss ("Overland Reply") [Dkt. No. 70] 6. But Parducci alleges in his Amended Complaint that "[p]ursuant to his duties and responsibilities as Trustee of the Trust, [he] requested a seven-year history of the amount of insurance that was being carried on the Senior Parduccis' residence." Am. Compl. ¶ 10. He then received the 2013 Report in January 2016 and again in May 2017 along with an additional 2010 Report. *Id.* ¶¶ 10–11. Based on these documents, "it appeared that the Parduccis' home had been over-insured," which is what prompted him to acquire a new agent and ask for new estimates. *Id.* ¶ 12, 19. Given these additional factual allegations, I find Parducci has answered this question.

### 4. When and how did Parducci's new agent forward his request to reduce coverage based on his lower replacement value estimates?

Overland argues that Parducci "does not provide even approximate dates for when he requested his new AMCO agent forward his request to reduce coverage, despite having the knowledge of when he himself made this request." Overland Reply 6. Even if Parducci does not know who internally refused his request, I directed him to "still allege how he asked to change the replacement cost estimate, when he made the request, and who (to the best of his ability) he

12

communicated with." Order at 11. Although Parducci does allege when he initially made the request, this is the only detail he has failed to allege.

### 5. Who at AMCO refused Parducci's request, when was that request refused, and what the form of the refusal was?

Parducci alleges that his "first request to lower the coverage was refused between August 2016 and February 2017; his second request was refused in or about April 2017." Am. Compl. ¶ 21. He admits that he "does not know the exact date that his requests were refused or the manner in which the Lincoln Leavitt agency forwarded his requests to reduce coverage to AMCO, but this information and the specific dates should be obtainable in discovery." *Id.* He points out that, as acknowledged in my previous order, he "allege[s] what he can and explain[s] why certain gaps will require discovery." Oppo. Overland MTD 9 (citing to Order at 11). He also emphasizes that my previous order recognized that he may not know "who in AMCO internally rejected his bid to change the replacement cost estimate of his home." Order at 10–11.

Overland points out that Parducci as failed to explain what exactly happened between 2016 and 2017 and if he renewed the policy. Overland MTD 8. However, this was previously discussed in the context of whether he sufficiently alleged a breach of contract claim. Order at 12–13. He does not bring a breach of contract claim in his Amended Complaint, and discussion of policy renewal is not necessarily relevant to when his requests for cost reduction were refused.

As discussed in this section, the only question Parducci does not answer that is within his knowledge is when he initially requested the reduction in coverage amounts based on the lower replacement value estimates. He has sufficiently alleged that: (i) the 2010 and 2013 Reports show which AMCO and Overland agents or employees made the specific misrepresentations; (ii) these misrepresentations occurred at least in 2010 and 2013, as indicated in the two Reports, and carried on until 2017 as indicated in the renewal notices; (iii), he discovered the misrepresentation when he compared alternate estimates obtained in 2016 and 2017 to those reports; (iv) and his requests for lowering coverage were denied, although he admits he does not know how his agent forwarded his request and who exactly denied them. The Amended Complaint plausibly alleges fraud under Rule 9(b). AMCO's and Overland's motions to dismiss the intentional misrepresentation,

13

negligent misrepresentation and elder abuse claims are DENIED.

## II. UCL CLAIMS

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. "Each of these three adjectives captures a separate and distinct theory of liability." *Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) (quotation marks omitted). Relevant here, the "fraudulent" prong requires Rule 9(b) heightened pleading. I previously dismissed Parducci's UCL claims because he had not met Rule 9(b) pleading standard for fraud. Order at 14–15. Because I find Parducci has now met that standard, his UCL claims are sufficiently alleged in the Amended Complaint.[3] AMCO's and Overland's motions to dismiss the UCL claim are DENIED.

## III. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Parducci brings an additional claim against AMCO for breach of the implied covenant of good faith and fair dealing. AMCO argues that it is "well settled law that without a breach of the contract, there can be no breach of the covenant of good faith and fair dealing." AMCO MTD 11 (citing to *Waller v. Truck Ins. Exch.*, 11 Cal. 4th 1, 36 (1995)). Because he does not bring a claim for breach of contract, AMCO contends that his bad faith claim necessarily fails. *Id.*

However, "breach of a specific provision of the contract is not a necessary prerequisite to a claim for breach of the implied covenant of good faith and fair dealing." *King v. Nat'l Gen. Ins. Co.*, 129 F. Supp. 3d 925 (N.D. Cal. 2015) (citation and quotation marks omitted). The defendants in *King* raised the same argument as AMCO. The Hon. Donna S. Ryu found that *Waller* "do[es] not support their argument, because [that case] stand[s] for the proposition that a first party bad faith claim requires an insured to show that he was owed benefits under the contract." *King*, 129 F. Supp. 3d at 941.[4] The *King* plaintiff contended that defendants breached the implied covenant

---

[3] Parties disagree on whether the UCL claims can continue under the "unlawful" or "unfair" prongs if Rule 9(b) is not met, but because I find Rule 9(b) has been met, those arguments need not be addressed.

[4] *See Waters v. United Servs. Auto. Assn.*, 41 Cal. App .4th 1063, 1070 (1996) ("'First party bad faith lawsuits' involve an insured's claims against the insurer under coverages written for the

14

of good faith and fair dealing by "failing to offer rates and calculate premiums in compliance with their contractual obligations and/or rate filings." *Id.* at 940. Similarly, Parducci claims that AMCO undertook a contractual obligation to provide estimates, and the breach of implied covenant occurred when AMCO did not obtain those estimates in good faith. Am. Compl. ¶ 53 ("Plaintiff's insurance policy provides: 'You are encouraged to obtain a current estimate of the cost to rebuild your home *from your insurance agent, broker or insurance company* or an independent appraisal from a local contractor, architect or real estate appraiser.'") (emphasis added). By undertaking that AMCO will provide estimates, the implied covenant was breached when AMCO failed to give Parduccis' interest at least as much consideration as its own. *Id.* ¶ 59. Parducci is not required to bring a breach of contract claim along with his breach of implied covenant claim given the type of bad faith claim he has brought here.

AMCO also argues that under California law, claims for "'bad faith,' or breach of implied covenant of good faith and fair dealing, require an improper withholding of benefits under an insurance policy." AMCO MTD 12. The *King* defendants made a similar argument that a "bad faith" claim is limited to situations where an insurer has withheld payment of an insured's claim. *King*, 129 F. Supp. 3d at 941. Judge Ryu clarified, "[t]hat is one type of bad faith claim, but not the only type, and it is not the bad faith claim asserted by Plaintiffs." *Id.* Similarly, Parducci is not claiming that AMCO breached the implied covenant by withholding benefits, but instead because it was not calculating premiums in good faith. It allegedly breached the implied covenant of good faith by "refusing to acknowledge that it had a duty to the Parduccis to perform an accurate calculation," and instead "utilizing a replacement cost analysis that it knew or should have known was inaccurate, inflated or incorrect." Am. Compl. ¶ 59. AMCO's motion to dismiss his claim for breach of implied covenant of good faith and fair dealing is DENIED.

insured's direct benefit under a first party policy. The gravamen of a first party lawsuit is a breach of the implied covenant of good faith and fair dealing by refusing, without proper cause, to compensate the insured for a loss covered by the policy, or by unreasonably delaying payments due under the policy."

15

# CONCLUSION

AMCO's and Overland's motions to dismiss are DENIED.

**IT IS SO ORDERED.**

Dated: November 25, 2019



William H. Orrick
United States District Judge