1
2
3
4                    UNITED STATES DISTRICT COURT
5                  NORTHERN DISTRICT OF CALIFORNIA
6

7   RICHARD P. PARDUCCI,              Case No. 18-cv-07162-WHO
8            Plaintiff,
9        v.                           **ORDER DENYING MOTION FOR
                                      CLASS CERTIFICATION AND
10  AMCO INSURANCE COMPANY,           DENYING IN PART AND GRANTING
                                      IN PART MOTION FOR SUMMARY
11           Defendant.               JUDGMENT**

                                      Re: Dkt. Nos. 139, 143, 152, 159, 164
12
13          Before me are plaintiff Richard Parducci's motion for class certification and defendant

14  AMCO Insurance Company's ("AMCO") motion for summary judgment concerning AMCO's

15  purported scheme to overcharge customers of its homeowners' insurance by intentionally

16  overestimating the replacement cost of their homes.  Class certification is DENIED because the

17  individualized issues involved in insurance coverage are so material and numerous that Parducci's

18  claims are not common or typical, the class claims do not predominate over the individual issues,

19  and class treatment is not superior to individual treatment.  Summary judgment is DENIED except

20  on AMCO's elder abuse claim.  Genuine disputes of material fact exist, including whether the

21  Parducci home was overinsured and whether Parducci's request to lower coverage was reasonable.

22                              **BACKGROUND**

23  **I.      FACTUAL BACKGROUND**

24          This dispute arises from a homeowners' insurance policy covering the Ukiah, California,

25  home of Margarett Parducci and the late John Parducci (collectively, "the Parduccis").  FAC [Dkt.

26  No. 59] ¶¶ 1, 8.  In 2018, the Parduccis' grandson, Richard Parducci, filed this lawsuit in his

27  capacity as conservator for and on behalf of Margarett Parducci, and as Trustee of the John A.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Parducci and Margarett L. Parducci Survivor's Trust.  Dkt. Nos. 1, 59.  Parducci contends that for

2    at least seven years, his grandparents' home was overinsured because of inflated replacement cost

3    values allegedly determined by AMCO, which insured the residence.[1]  FAC at ¶ 9, 12, 14.  As a

4    result, Parducci argues, his grandparents paid excessive premiums on coverage limits that they

5    "would never be able to collect if there had been a loss."  *Id*. at ¶ 12.

6         AMCO explains that it requests a third-party inspection of high-value homes such as the

7    Parduccis'—those valued at over $750,000—every seven to 10 years.[2]  Mot. for Summ. J.

8    ("MSJ") [Dkt. No. 152], Ex. I at 7:27-8:4; Ex. J at 157:16-20.  To complete these inspections, that

9    third party takes measurements, visually assesses features of the home, and then inputs that

10   information into a "third party valuation platform" to generate an estimated replacement cost.

11   MSJ Oppo. [Dkt. No. 160] Ex. 4 at 9:27-10:7.  AMCO also requests a coverage amount.  *Id*., Ex.

12   8, at 64-65.

13        When the estimated replacement cost is *higher* than the requested coverage amount,

14   AMCO automatically increases the replacement cost coverage—also known as the "Coverage A"

15   limit—to at least 100% of the estimated replacement cost.  MSJ at 5:13-14 (citing Ex. J at 38:15-

16   22).  The parties have referred to these homes as being "underinsured."  *Id*. at 37:15-25; 38:15-22.

17   In such cases, AMCO sends the insured a letter notifying them of the increase and alerts their

18   agent.  *Id*.

19        When the estimated replacement cost is *lower* than what the home is insured for—when

20   homes are "overinsured"—AMCO keeps the higher Coverage A limit.[3]  MSJ Oppo., Ex. 8 at

21   _____

22   [1] AMCO policy documents define replacement cost coverage as that "intended to provide for the
     cost to repair or replace the damaged or destroyed dwelling, without a deduction for physical

23   depreciation."  Mot. for Class Certification ("Class Cert. Mot.") [Dkt. No. 143], Ex. 1 at AMCO-

24   PAR000375.

25   [2] The parties use the terms "inspection," "appraisal," and "survey" interchangeably, as do I.

26   [3] Although AMCO uses the term "overinsurance," it contends that when a replacement cost is
     lower than the requested Coverage A limit, it "does not mean that the requested Coverage A limits

27   are in fact too high."  Class Cert. Oppo. at 10:14-15.  According to AMCO, lower replacement
     cost estimates may be attributed to: (1) natural variations among estimates; (2) fluctuating repair

28   costs; and (3) contingences to cover the actual cost of rebuilding a home.  *Id*. at 10-11.

United States District Court
Northern District of California

1    51:25-52:9.  AMCO then notifies the insured's agent of the difference, and provides them with a

2    copy of the inspection "to have [a] conversation with the customer" about the amount of their

3    insurance.  MSJ, Ex. J at 35:11-21; 36:5-10.

4         When a policy is renewed, AMCO adjusts policy limits based on inflation factors.  Oppo.

5    to Mot. for Class Certification ("Class Cert. Oppo.") [Dkt. No. 151] 12:5-11; MSJ Oppo., Ex. 8 at

6    87:9-19.  AMCO notes that annual inflation adjustments are disclosed to customers in their

7    policies.  Class Cert. Oppo. at 12:10 (citing Ex. B at AMCO-PAR000010, AMCO-PAR000034).[4]

8         AMCO insured the Parduccis' home from 2008 to 2018.  MSJ, Ex. C at 5:13-14.  AMCO

9    contends that since at least 2012, with each policy renewal the Parduccis received the following

10   "Notice to Customers," which reads in part:

11        **READ YOUR POLICY AND POLICY DECLARATIONS PAGE:**

12        **CAREFULLY:** The policy declarations page shows the specific coverage limits
          you have purchased for your dwelling, personal property, separate structures such
13        as detached garages, and additional living expenses.  The actual policy and
          endorsements provide the details on extensions of coverage, limitations of
14        coverage, and coverage conditions and exclusions. . . . It is important to take the
          time to consider whether the limits and limitations of your policy meet your needs.
15        Contact your agent, broker, or insurance company if you have questions about what
          is covered or if you want to discuss your coverage options.
16

17   And:

18        **THE RESIDENTIAL DWELLING COVERAGE LIMIT:** The coverage limits
          on the dwelling structure should be high enough so you can rebuild your home if it
19        is <u>completely</u> destroyed.  Please note:

20
          •  The cost to rebuild your home is almost always different from the market
21           value.
             …
22        •  The cost to rebuild your home should be adjusted each year to account for
             inflation.
23
             …
24        You are encouraged to obtain a current estimate of the cost to rebuild your home
25        from your insurance agent, broker, or insurance company or an independent
          appraisal from a local contractor, architect, or real estate appraiser.  If you do
26        obtain an estimate of replacement value, and wish to change your policy limits,
          contact your insurance company.  While not a guarantee, a current estimate can
27

28   ───────────────────
     [4] The "AMCO-PAR" citation references the pagination on the documents.

help protect you against being underinsured.

MSJ at 3-4 (citing Ex. D at AMCO-PAR001661-62).  The Parduccis also received an "Important

Notice" stating:

> The Coverage A Dwelling limit shown on your declarations page is an estimated
> replacement cost based on general information about your home.  It is developed
> from models that use cost of construction materials and labor rates for like homes
> in the area.  The actual cost to replace your home may be significantly different.
> Allied does not guarantee that this figure will represent the actual cost to replace
> your home.  You are responsible for selecting the appropriate amount of coverage
> and you may obtain an appraisal or contractor estimate, at your own expense,
> which Allied will consider and accept, if reasonable.  Higher coverage limits may
> be selected and will result in higher premiums.

*Id*. at AMCO-PAR001658.

Parducci began handling insurance matters for his grandparents around 2008.  MSJ Oppo.

at 1:27.  Around 2015, he hired an attorney to review their insurance policies.  *Id*. at 2:2-4.  In

January 2016, Parducci, through his attorney, requested copies of his grandparents' insurance

documents "because it appeared to him that the replacement cost value for the Parduccis' home

was grossly over-insured."  FAC at ¶ 10.  In response, the Parducci' insurance company provided

a copy of a report summarizing a 2013 inspection of the Parducci residence.  MSJ Oppo. at 19; *see*

*also* Exs. 7, 15.  The 2013 report listed the appraised replacement cost at $1,528,000, and the

requested coverage amount at $1,589,600.  *Id*., Ex. 7 at AMCO-PAR002014.  That same year,

AMCO set the Parduccis' Coverage A amount at $1,634,600—$45,000 more than the requested

coverage amount, and $106,600 more than the appraised cost.  *Id*., Ex. 11 at AMCO-PAR000169.

AMCO attributes the $45,000 increase to inflation.  Class Cert. Oppo. at 4:11-17 (citing Ex. J at

78:20-25).

In August 2016, Parducci moved his grandparents' policies to a different AMCO agent "in

hopes of obtaining an accurate replacement valuation."  FAC at ¶ 19.  Parducci's attorney made at

least three trips to the Parducci home to measure square footage, count bathrooms and chimneys,

and examine crown molding, cabinetry, and flooring, including a visit in "late 2016, early 2017."

MSJ Oppo. at 6:10-16; Ex. 3 at 31-32, 35-36.  The attorney testified that those visits occurred

> [b]ecause we were concerned about the valuation on the home and how those
> valuations were arrived at.  And I had seen some documents that indicated to me

that we probably needed to go take a look and ascertain what was really on the ground and determine whether or not, in fact, those values were correct.

*Id.*, Ex. 3 at 31:8-14.

"Around this time," the Parduccis' insurance agent requested that AMCO "review or lower the Coverage A amount." MSJ Oppo. at 6:19-21 (citing in part Ex. 18). The agent initially asked AMCO to lower the Coverage A limit by more than 50%, to $750,000. *Id.*, Ex. 18 at 4. The agent then stated that he "misspoke," and instead asked that the information gathered by Parducci be run through its cost estimator. *Id.* at 2. AMCO said $750,000 was "too low," but that it would consider reducing the Coverage A limit to the requested coverage amount stated in the 2013 inspection report: $1,589,600. *See id.* at 3.

The parties dispute what happened next. AMCO asserts that Parducci's attorney told AMCO that the information used in the 2013 appraisal was "WRONG!," but when asked for proof, offered no substantiation. MSJ at 6:7-13 (citing Ex. M at 2). Parducci says he obtained another replacement cost value—$1,021,602—generated by a local contractor who appraised the home. MSJ Oppo. at 7 (citing Ex. 19). AMCO contradicts itself as to whether it received this estimate. *See* MSJ at 6:14-15 ("Although Plaintiff had obtained one repair estimate from a local contractor, Mark Walker, he never provided it to AMCO."); Class Cert. Oppo. at 7:24-25 ("Plaintiff did provide to AMCO one replacement cost estimate from his contractor Mark Walker. . ."). Parducci also contends that AMCO refused to run the information he had gathered about his grandparents' home through its cost estimator. MSJ Oppo. at 7:4-5. He alleges that sometime during the fall of 2016, he provided AMCO with a replacement coverage amount that he generated using his own estimator. *Id.* at 6:17-18 (citing Exs. 16, 17). AMCO denies that this estimate was ever completed or provided. MSJ at 7:6-17 (citing in part Ex. A at 97:3-11, 17-21).

The Parduccis continued to insure their home with AMCO through 2018, when AMCO terminated coverage. Class Cert. Oppo., Ex. L. Parducci then obtained an estimate from a different insurance provider, showing a replacement cost of $1,911,000. *Id.*, Ex. M; MSJ at 14:2-4. In 2020, Parducci insured the home with another insurance company, with the Coverage A limit set at $1,694,000. MSJ at 4:21-22 (citing Ex. F. at 62:4-6, 13-14).

United States District Court
Northern District of California

## II.     PROCEDURAL BACKGROUND

Parducci filed his original complaint against AMCO and Overland Solutions, Inc. ("Overland"), the third-party appraiser, alleging violations of California's Unfair Competition Law ("UCL"), breach of the covenant of good faith and fair dealing, breach of contract, negligent and intentional misrepresentation, and financial elder abuse.  *See* Dkt. No. 1.  In July 2019, I dismissed Parducci's complaint because he failed to plead fraud with the requisite particularity and failed to state other claims upon which relief could be granted.  Dkt. No. 56 at 1.  Parducci then filed the FAC bringing almost all of the same claims.  Dkt. No. 59.  In November 2019, I denied AMCO's and Overland's motions to dismiss, finding that Parducci sufficiently pleaded fraud, forming the basis for his intentional misrepresentation, negligent misrepresentation, elder abuse, and fraudulent business practices claims.  Dkt. No. 72 at 1.  I also found that he sufficiently alleged a breach of the implied covenant of good faith and fair dealing against AMCO.  *Id.*

Since then, Parducci voluntarily dismissed his claims against Overland, which then dismissed its claims against third-party defendant Mark Davis Insurance Agency, Inc.  Dkt. Nos. 153, 157.  AMCO is the only defendant remaining.

## LEGAL STANDARD

## I.     FEDERAL RULE OF CIVIL PROCEDURE 23

Federal Rule of Civil Procedure 23 governs class actions.  "Before certifying a class, the trial court must conduct a rigorous analysis to determine whether the party seeking certification has met the prerequisites of Rule 23."  *Mazza v. Am. Honda Motor*, 666 F.3d 581, 588 (9th Cir. 2012) (internal citation omitted).  The burden is on the party seeking certification to show that the prerequisites have been met.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Conn. Ret. Plans & Tr. Funds v. Amgen, Inc.*, 660 F.3d 1170, 1175 (9th Cir. 2011).

Certification under Rule 23 is a two-step process.  The party seeking certification must first satisfy the four threshold requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy.  Specifically, Rule 23(a) requires a showing that:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

United States District Court
Northern District of California

(3) the claims or defenses of the representative parties are typical of those of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).  After meeting this threshold, the party seeking certification must then establish one of three grounds set forth in Rule 23(b).  Fed. R. Civ. P. 23(b).  Parducci seeks certification under Rule 23(b)(2) and 23(b)(3).  Class Cert. Mot. at 15.

A class action may proceed under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

Rule 23(b)(3) permits a class action when "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  In deciding this, courts consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action."

*Id.*

In considering a motion for class certification, the substantive allegations of the complaint are accepted as true, but "the court need not accept conclusory or generic allegations regarding the suitability of the litigation for resolution through class action."  *Hanni v. Am. Airlines*, No. C-08-00732-CW, 2010 WL 289297, at *8 (N.D. Cal. Jan. 15, 2010).   The court may also "consider supplemental evidentiary submissions of the parties."  *Id.*

The trial court's "rigorous" class-certification analysis may "entail some overlap with the merits of the plaintiff's underlying claim."  *See Dukes*, 564 U.S. at 351.  However, "Rule 23 grants

courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).  "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id*.

## II.   SUMMARY JUDGMENT

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  To prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324.  The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant.  *Id.* at 255.  In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.*  However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment.  *See Thornhill Publ'g. Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

## I.   CLASS CERTIFICATION

Parducci seeks certification of the following class:

> All owners of a homeowners insurance policy issued by AMCO Insurance Company that insured a dwelling in California on a replacement cost basis utilizing AMCO or its agent's survey, appraisal or inspection methodology to calculate the dwelling coverage limits and whose "Change in Coverage" following the survey,

appraisal, or inspection was less than zero.[5]

Class Cert. Mot. at 1.  In addition, he seeks certification of the following subclass:

> All owners 65 years of age or older of a homeowners insurance policy issued by AMCO Insurance Company that insured a dwelling in California on a replacement cost basis utilizing AMCO or its agent's survey, appraisal or inspection methodology to calculate the dwelling coverage limits, whose "Change in Coverage" following the survey, appraisal, or inspection was less than zero, and whose Coverage A Dwelling amount was not lowered as a result.

*Id.*

The problems attendant to deciding this case on a class basis are myriad as a result of the many individualized issues involved.[6]  To start, each class member will have a unique perspective on the value of her home and the balance between wanting more coverage and lower premiums. Real estate appraisers, contractors, and knowledgeable real estate professionals vary substantially in their opinions regarding fair market value and the cost of replacement for any home.  More specific to this case, AMCO alleges that its practice is to disclose the third-party appraisal value to

---

[5] Parducci defines "Change in Coverage" as "the variation between a home's replacement cost as determined by the survey, appraisal or inspection and the actual replacement cost or Coverage A amount set by AMCO for the purposes of insuring a home."  Class Cert. Mot. at 1:23-2:2.  This number appears as a percentage on the survey, appraisal, or inspection reports.  *Id.* at 2:2-4 (citing Ex. 2 at AMCO-PAR002014).  The Change in Coverage listed on the Parduccis' 2013 inspection report was -4%.  *Id.*

[6] AMCO also argues that certification is inappropriate because Parducci relies on a "new and unpleaded theory of liability" that AMCO "should have relied on Overland's inspections, wrongfully failed to act on them in all instances, and failed to disclose this practice to its insureds."  Class Cert. Oppo. at 12:18, 13:21-23.  AMCO claims that this differs from Parducci's initial allegation that Overland and AMCO "collude[d] to create inspection reports with inflated replacement cost values."  *Id.* at 13:15-17.  AMCO's argument is unpersuasive because the heart of Parducci's argument in this motion remains the same as in the FAC: that AMCO engaged in a scheme to inflate insurance coverage and failed to disclose this to its customers.  *See, e.g.,* FAC at ¶ 18 ("[a]t no time . . . did AMCO disclose to Plaintiff or the Parduccis that the replacement cost values assigned by AMCO to the Parducci home were excessive and did not represent the true replacement cost value of the Parduccis' home.").  Discovery changed Parducci's initial understanding of the case's facts, including how AMCO purportedly used Overland's reports in setting replacement cost values.  *See* Class Cert. Reply [Dkt. No. 158] 3.  Courts in this district recognize that facts yielded through discovery may affect the legal theories that arise under class certification.  *See, e.g., Brown v. Hain Celestial Grp., Inc.*, No. C-11-03082-LB, 2014 WL 6483216, at *6 (N.D. Cal. Nov. 18, 2014) ("Discovery too regularly changes the parties' initial understanding of a case's facts"); *In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig.*, 270 F.R.D. 521, 530 (N.D. Cal. 2010) (finding that plaintiffs were "simply narrowing their breach of contract theory . . . based on factual developments that have occurred since the filing of the complaint.").

United States District Court
Northern District of California

United States District Court
Northern District of California

the insurance agent, whose duty is to the homeowner in recommending the appropriate amount of insurance. *See* MSJ, Ex. J at 35:11-21; 36:5-10. There may be instances where AMCO did not comply with its practice; instances where the agent failed to pass on the information; instances where the homeowner preferred purchasing more insurance because she believed the appraisal was too low or because she was more comfortable with more insurance; and instances, as in Parducci's case, where the insured engaged in substantial communication with AMCO that did or did not resolve satisfactorily.

Parducci argues that his putative class presents a "non-exhaustive list of common contentions," including whether AMCO's business practices were unlawful, unfair, or deceptive; whether it "engaged in a widespread and systematic practice" causing class members to pay more for insurance coverage; whether AMCO breached the covenant of good faith and fair dealing or committed elder abuse; and whether class members were damaged. Class Cert. Mot. at 17:14-22. He contends that AMCO's policies and practices provide the "glue" holding the class together. *See id*. at 17-18. Specifically, he references AMCO's alleged failure to directly inform insureds of inspection results or overinsurance, as well as its "uniform practice of automatically setting the Coverage A amount at its own higher 'requested coverage amount.'" *Id*. at 18:4-11. He cites a random sample of high-value homes appraised by Overland as compared to AMCO's requested coverage amount. *Id*., Ex. 9 (filed under seal). In nine out of the sampled 11 cases where the home was "overinsured," AMCO set a Coverage A limit equal to or higher than the requested coverage amount. *See id*.

Parducci also asserts that his claims are typical of the class because he "owned a homeowners insurance policy issued by AMCO in California insuring a dwelling on a replacement cost basis and an Overland appraisal was used to calculate the replacement cost value." *Id*. at 19:4-6. He also notes that his grandparents were over the age of 65 during the relevant time, that their home was overinsured in 2013, and that they were never directly informed of the overinsurance, nor received a copy of any inspection report prior to their attorney's request. *Id*. at 19:6-15 (citing Exs. 2, 4, 19, 20). And he argues that the individualized factors are irrelevant. "What matters," he contends, "is that AMCO automatically applies its higher replacement cost

10

1    amount when it considers a home 'overinsured' and rejects its inspection company's appraised

2    value"—and then fails to inform the insured.  Class Cert. Reply at 8:16-20.

3         AMCO has the better of this argument: Any determination of liability would require

4    individual assessments of (1) the value of each class member's home to determine whether it was

5    in fact overinsured beyond its "true value;" and (2) the value that each class member placed on her

6    coverage.  Class Cert. Oppo. at 16:8-10.  This, AMCO notes, necessarily includes consideration of

7    "why the applicable coverage amount was selected, whether coverage affords the insured a desired

8    level of comfort, security, and peace-of-mind, and whether coverage meets the insured's personal

9    and third party contractual needs."[7]  *Id.* at 19:8-12.  It argues that these determinations would

10   require testimony from each class member, along with a case-by-case review of "every

11   agent/policy file to identify the insured's articulated requests for coverage, and any requests for

12   increases or decreases.  *See id.* (citing Ex. S at 5-6).  This is in part because AMCO "does not have

13   a mechanism for tracking" insureds who "rejected" replacement cost values or had them lowered.

14   *Id.*, Ex. S at 5-6.

15        Parducci's class theory overlooks the many factors that contribute to the Coverage A

16   amount of a particular policy, including the characteristics and location of a home, along with the

17   preferences of the insured.  It also sidesteps statements from Parducci's contractor and a

18   consultant hired by AMCO, both of whom testified that home inspections are expected to vary

19   widely.  *See* Class Cert. Oppo., Ex. E at 33:2-3 ("[Y]ou're going to get all kinds of different

20   numbers from different people."); Suggs Decl. Ex. 1 at ¶ 19 ("It is very common to see variations

21   in costs between contractors in the range of 20% to 25%.").

22        And individualized inquiries also predominate Parducci's arguments about notice.

23   Parducci contends that AMCO's "uniform" failure to directly disclose to overinsured

24   policyholders the appraised value of their home or their options for lowering coverage

25

26   ───────────────────
     [7] AMCO cites *Everett v. State Farm Gen. Ins. Co.*, 162 Cal. App. 4th 649 (2008), in arguing in "it
27   is the insured's responsibility [to] obtain the correct amount of coverage."  Class Cert Oppo. at
     17:12-13.  I discuss *Everett* in more detail when weighing AMCO's motion for summary
28   judgment.  Because I find that individualized issues doom class certification, I need not address
     *Everett* now.

United States District Court
Northern District of California

predominate over any "manufacture[d] individual issues." *See* Class Cert. Reply at 7:11-15.  But just because AMCO did not directly notify customers of any alleged overinsurance does not mean that they were uninformed.  AMCO's practice is to notify the insured's agent, who is then given a copy of the inspection report and encouraged to discuss the matter with their client.  *See* MSJ, Ex. J at 35:11-21; 36:5-10.  Parducci acknowledges this, stating that "[t]he only way an insured may have knowledge of the overinsurance and could express an individual preference as to coverage would be *if the insurance agent had a conversation with the insured*."  *See* Class Cert. Reply at 12:24-26 (emphasis added).  Parducci concedes a similarly individual—and important—factor when he contends that "AMCO's practice was to never lower coverage *absent the insured's explicit request*."  *See* Class Cert. Mot. at 23:11-12 (emphasis added).  Such conversations or requests would be dispositive of many, if not all, of Parducci's claims.  But the only way to determine whether they took place would be through a case-by-case review of each class member's insurance file.  *See* Class Cert. Oppo., Ex. S at 5-6 (noting that AMCO has no "mechanism" for tracking insureds who rejected replacement cost values or for whom those values were lowered).  Parducci's evidence shows that AMCO did in fact keep the lower amount in some cases, further supporting the need to review individual insurance files as to determine whether and why any adjustments were made.  *See* Class Cert. Mot., Ex. 9 (filed under seal).

These individualized considerations ultimately thwart many of the requirements for class certification.  First, commonality is not met, as required by Rule 23(a).  Plaintiffs must show that the class members suffered "the same injury," meaning their claims "depend on a common contention" that is of such a nature that "determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] in one stroke."  *Dukes*, 564 U.S. at 350.  Plaintiffs must demonstrate not merely the existence of a common question, but rather "the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation."  *Id*. (internal citation omitted).  Whether a property is overinsured—and whether the homeowner had notice of such—would require a review of each class member's property and insurance file, including any conversations they had with their agent.  Class members would need to present individualized evidence to assert AMCO's liability, overwhelming the common questions that

1   exist and preventing common answers from resolving the litigation.

2       Typicality is also not met.  Rule 23(a) requires that claims or defenses of the representative

3   parties be "typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  The mere

4   presence of differing facts—for example, "as to the various products purchased, the methods of

5   purchase, or the amount of damage sustained by individual plaintiffs"—does not defeat typicality.

6   *In re CRT Antitrust Litig.*, MDL No. 1917, 2013 WL 5429718, at *10 (N.D. Cal. June 20, 2013).

7   "The test of typicality is whether other members have the same or similar injury, whether the

8   action is based on conduct which is not unique to the named plaintiffs, and whether other class

9   members have been injured by the same course of conduct."  *Hanon v. Dataproducts Corp.*, 976

10  F.2d 497, 508 (9th Cir. 1992) (citation omitted).

11      AMCO argues that facts specific to Parducci's case render him atypical of the class.

12  AMCO points to: (1) the "custom characteristics" and "unique site location" of the Parducci home;

13  (2) Parducci's request to lower his coverage "by more than half;" (3) Parducci's purported failure

14  to provide AMCO with any substantiation for that request; (4) Walker's estimate; (5) AMCO's

15  offer to reduce coverage to the 2013 inspection value; and (6) Parducci's subsequent, more

16  expensive, insurance policy.  *See* Class Cert. Oppo. at 24.

17      While typicality does not require identical facts, Parducci's conduct and claim are atypical.

18  Of particular note are his request to lower his insurance coverage, AMCO's response, the

19  substantiation that Parducci provided (including Walker's estimate), and the actual replacement

20  cost of the house.  Although disputed, these facts are pertinent to Parducci's misrepresentation and

21  breach of good faith and fair dealing claims, as detailed later in this Order.  While class members

22  might share the same or a similar injury if their homes were overinsured and AMCO did not

23  inform them of such, the course of conduct in Parducci's case—by both AMCO and Parducci—

24  sets him apart.  This difference is more significant than simple variation in the coverage purchased

25  or method of payment, as it opens the door for unique claims by both parties.  *See In re CRT*

26  *Antitrust Litig.*, 2013 WL 5429718, at *10.  With no evidence of a similar back-and-forth between

27  AMCO and other class members, I find that Parducci's claims are not typical of the rest of the

28  proposed class.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Nor is predominance met.  It is the first consideration under Rule 23(b)(3)—whether

2  "questions of law or fact common to class members predominate over any questions affecting only

3  individual members."  Fed. R. Civ. P. 23(b)(3).  The predominance inquiry "tests whether

4  proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem*

5  *Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  This requires "careful scrutiny to the relation

6  between common and individual questions in a case."  *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S.

7  442, 453 (2016).  Individual questions arise when "members of a proposed class will need to

8  present evidence that varies from member to member."  *Id.*  Common questions are those "where

9  the same evidence will suffice for each member to make a prima facie showing or the issue is

10  susceptible to generalized, class-wide proof."  *Id.* (internal quotation marks omitted).

11    The individualized issues and evidence that each class member would have to present, as

12  discussed throughout this section, overwhelms any common question.  Parducci fails to show

13  predominance under Rule 23(b)(3).[8]

14    Nor is class treatment superior to individual cases.  Rule 23(b)(3) also requires that a class

15  action be "superior to other available methods for fairly and efficiently adjudicating the

16  controversy."  Fed. R. Civ. P. 23(b)(3).  The individualized evidence that is necessary to

17  adjudicate each claim, leading to differing causes of action and defenses, make separate suits a

18  superior method for determining any liability or damages.

19    In sum, common questions will not resolve issues for the class and Parducci's claims are

20  atypical, failing to fulfill Rule 23(a).  The class is not certifiable under Rule 23(b)(3) because

21  individualized issues predominate and nd separate suits offer a superior method of resolution.

22  Parducci's motion for class certification is DENIED.[9]

23

24

25    _____

26  [8] Because I find that individualized issues predominate and warrant denial of certification, I need
     not address the arguments surrounding Parducci's computation of damages.

27  [9] Because the class cannot be certified under Rule 23(a), I do not reach whether the putative class
     could have been certified under Rule 23(b)(2) with respect to the notice provided to "overinsured"

28  class members.

## II.     SUMMARY JUDGMENT

### A.     *EVERETT*

AMCO opens with a familiar argument: that Parducci's claims fail "because the law places the responsibility of selecting the correct policy limits on the Parduccis."  MSJ at 8:9-10.  It cites *Everett* in support, just as it did when it raised this argument in its first motion to dismiss.  *See id*. at 9:15-17; Dkt. No. 17 at 4.  But *Everett* is distinguishable.  *See* Order Granting Mots. to Dismiss ("First MTD Order") [Dkt. No. 56] at 7-8.

AMCO contends that Parducci has "abandoned any 'scheme to defraud'" and instead centers his argument on a "failure to inform theory" like that used by the plaintiff in *Everett*.  MSJ at 11:16-25.  I previously distinguished this case from *Everett* on those grounds, finding that the failure to inform claim in *Everett* was "far different than the active deception alleged here."  *See id*. at 11:3-5; First MTD Order at 8:16.  Then, the "core allegation" in the complaint was that "AMCO and Overland engaged in a scheme to deceive customers and overcharge them based on inflated replacement value estimates"—unlike the alleged fraud in *Everett*, which "revolved around whether the plaintiff had been informed that her homeowner's policy no longer contained full replacement cost coverage."  First MTD Order at 8:11-16.  But although Overland is no longer a party to this suit, the core allegation remains sufficiently similar.  Parducci still argues "active deception by AMCO to inflate the replacement cost value" of his grandparents' home.  MSJ Oppo. at 10:1-4.  The purported scheme still exists.

Even if Parducci had abandoned his claims about a scheme, *Everett* is a different case.  *Everett* states that "[i]t is up to the insured to determine whether he or she has sufficient coverage for his or her needs."  *Everett*, 162 Cal. App. 4th at 660.  But the plaintiff in *Everett* did not attempt to make such a determination.  She never requested that her insurance agent inspect her property nor "review her policy or increase the limits."  *Id*. at 652.  The court noted that if the plaintiff "did not understand what was being changed with respect to her coverage, she could have called her agent, or State Farm directly, for clarification.  She did not do so."  *Id*. at 663.  In contrast, Parducci sought clarification about the replacement cost coverage—and has offered evidence of doing so.  Parducci, via his agent, inquired about the amount of coverage.  MSJ

Oppo., Ex. 18 at 6.  He also attempted to generate a new estimate, both by using AMCO's own

estimator and an independent one.  *Id.*, Exs. 17, 18 at 2-3.  Although details of the conversation

are disputed, there is evidence of at least some effort by Parducci to obtain a different amount of

coverage.  *See id.*, Ex. 18 at 2-3.  *Everett* does not control this case.

## B.   UCL

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus.

& Prof. Code § 17200.  "Each of these three adjectives captures a separate and distinct theory of

liability."  *Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010).  The UCL's

"coverage is sweeping, embracing anything that can properly be called a business practice and that

at the same time is forbidden by law."  *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th

Cir. 2012).  The "unlawful" prong "borrows violations of other laws and treats them as

independently actionable."  *Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 837

(2006).  An "unfair" business practice is one that "violates established public policy" or is

"immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs

its benefits."  *McKell v. Wash. Mut. Inc.*, 142 Cal. App. 4th 1457, 1473 (2006).  Finally, to state a

claim for a fraudulent business practice, "it is necessary only to show that members of the public

are likely to be deceived."  *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009).

In addition to its *Everett* argument, AMCO asserts that Parducci's UCL claim fails because

there is no evidence showing that the Parducci residence was overinsured beyond its "true value."

MSJ at 12:10-19.  That is inaccurate.

Three pieces of evidence are key.  First is the estimate from Walker, the local contractor,

who priced the replacement cost at $1,021,602.  MSJ Oppo., Ex. 19.  AMCO dismisses this as a

"lowball estimate" that was "entirely subjective," using Walker's own testimony in doing so.  *See*

MSJ at 2:16-18 (citing in part Ex. B at 32:18-20 ("[I]t is definitely subjective, you know, when

someone says what is the quality of that home."), 49:11-13 ("There are other contractors in the

area that are charging significantly more, but I'm not them.")).  Second is the independent estimate

that Parducci obtained in 2018, after AMCO terminated coverage.  *Id.*, Ex. P.  AMCO argues that

the $1,911,000 replacement cost—$100,000 more than AMCO's—indicates that the Parducci

1   house was not overinsured.  MSJ at 14:2-8.  Parducci contends that wildfires in the area at the time

2   made it "increasingly hard to obtain insurance coverage."  MSJ Oppo. at 20:14-22 (citing in part

3   Ex. 23 at 45:22-46:3).  Finally, Parducci points to AMCO's own description of the home as

4   overinsured as creating a material question of fact.  *Id.* at 12:1-2; 12:23-26 (citing Ex. 8 at 63:14-

5   65:18).  AMCO argues that this "mischaracterizes AMCO's use of the designation

6   'overinsurance,' which underwriters merely use to signify a situation where the Coverage A limit

7   was higher than the Overland estimate."  MSJ Reply [Dkt. No. 165] 6:10-11.

8          Some of this evidence is weaker than others: For instance, Parducci's contractor admits he

9   is one of the cheaper contractors in the area, and that replacement cost estimates typically vary.

10  *See* MSJ, Ex. B at 33:1-6; 49:11-13.  But it is up to the jury to determine the weight and credibility

11  of evidence.  Parducci has provided sufficient evidence showing that a material fact—whether his

12  grandparents' home was overinsured—is in dispute.

13         AMCO's remaining arguments specific to certain prongs of the UCL are similarly

14  unpersuasive.  In challenging Parducci's claim of an unfair business practice, AMCO contends

15  that undisputed evidence shows that the valuation process is subjective and that there is no

16  evidence showing that AMCO's policies or practices were unfair "because they provide for full

17  disclosure of the conduct he claims was concealed from him."  MSJ at 15:9-13.

18         Parducci responds by arguing that AMCO acted unfairly by maintaining the higher

19  replacement cost value on his grandparents' home after the 2013 inspection and by failing to

20  "directly notify" him of doing so.  MSJ Oppo. at 14:7-19.  In support, Parducci points to policy

21  documents showing that AMCO maintained a replacement cost value on the Parducci home higher

22  than the 2013 estimate.  *See id.*, Exs. 1, 11, 20-22.  He also cites testimony from an AMCO

23  official who acknowledged there was "nothing" in Parducci's file documenting any conversation

24  between Parducci and his agent about the purported overinsurance.  *Id.*, Ex. 8 at 75:12-76:3.

25         Though the arguments and evidence unique to unfairness are slim, I find that whether

26  AMCO's alleged acts—maintaining the higher replacement cost value and not notifying

27  Parducci—were "immoral, unethical, oppressive or unscrupulous" and caused an injury that

28  outweighed its benefits is in dispute.  *See McKell*, 142 Cal. App. 4th at 1473.  Taken with the

United States District Court
Northern District of California

disputed facts mentioned above, this is enough for any claim brought under the unfair prong of the UCL to survive summary judgment.

The only new argument AMCO raises regarding fraud under the UCL is that "AMCO affirmatively notified Plaintiff or his agent of any alleged 'overinsurance' or any 'underinsurance' of a specified amount." MSJ at 14:24-26. AMCO cites no evidence supporting this, nor offers any further explanation. *See id*. AMCO makes a similar unsupported assertion in its reply. *See* MSJ Reply at 6:2-3 ("the differential was communicated to Plaintiff's insurance agent.").

In addition to testimony articulating AMCO's general practice of not directly notifying insureds of overinsurance situations, Parducci proffers: (1) an email from AMCO to Parducci's insurance agent that mentioned the 2013 inspection report but did not advise the agent to forward the information to Parducci or advise him that the house was overinsured; and (2) a lack of documentation of any follow-up conversation with the agent or Parducci, as confirmed in the AMCO official's deposition. MSJ Oppo. at 13:10-14:6 (citing Ex. 8, 67:8-71:8, 74:22-76:5; Ex. 12; Ex. 13. To the extent that these facts are in dispute—and it is unclear that they are, as AMCO offers no evidence in support of its argument—this too weighs in Parducci's favor, at least to survive summary judgment.

Finally, AMCO argues that Parducci's UCL claim fails as a matter of law because he is not entitled to restitution or injunctive relief. Parducci's counsel conceded at oral argument that any claim for injunctive relief was limited to the class claims, as Parducci is no longer insured by AMCO and now has the information (via this litigation) that would be covered by an injunction. Accordingly, I focus on the arguments surrounding restitution.

Restitution is "the return of the excess of what the plaintiff gave the defendant over the value of what the plaintiff received." *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 174 (2000). Under the UCL, restitution "must be of a measurable amount to restore to the plaintiff what has been acquired by violations of the statutes." *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 698 (2006). That amount must also be supported by evidence. *Id*. The Ninth Circuit has held that when calculating restitution under the UCL, "the focus is on the difference between what was paid and what a reasonable consumer would have paid at the time of

purchase without the fraudulent or omitted information." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015).

AMCO argues that Parducci has not supplied any method for measuring restitution, because he "has no theory by which to measure the value of AMCO's policy." MSJ at 16:21-17:16. It contends that the proper measure of restitution would be "the difference between what the insureds paid for the [p]olicy, that is, their premiums, and the value of what they received." *Id*. at 17:8-11. It dismisses the idea that value can be derived from the premiums paid or the difference between the policy limits received and those Parducci believes he should have received instead. *See id*. at 17:17-18. Instead, AMCO contends that calculating value requires "fact-intensive, individualized inquiries" into the home's value, the value of the specific coverage to the insured, and factors such as "reconstruction cost values, actuarial science, underwriting, insurance pricing, or market research" from experts—which Parducci has not provided. *See id*. at 17. Without such "evidence" of a measurable amount of restitution, AMCO argues, Parducci cannot recover under the UCL. *See id*.

AMCO cites no authority that requires this type of calculation to determine "value." Parducci responds with cases that rejected "cost minus value" as the sole calculation of restitution. *See* MSJ Oppo. at 14:27-15:5 (citing *Pulaski*, 802 F.3d 979; *Russell v. Kohl's Dep't Stores, Inc.*, No. CV-15-1143, 2015 WL 12781206, at *3-5 (C.D. Cal. Oct. 6, 2015) (citing other cases). Parducci argues that under *Pulaski*, restitution can be measured by the difference in the premium charged for the Coverage A limit (what was paid) and what would have been charged at the appraised value (what Parducci would have paid had he had the omitted information). *See* MSJ Oppo. at 16:1-3. As Parducci notes, those numbers can be derived from the 2013 inspection of his grandparents' home. *See id*. at 16:4.

AMCO attempts to distinguish *Pulaski*, arguing that the restitution calculation there "directly addressed" the allegedly unfair business practices by using a pricing ratio that set "advertisers' bids to the levels that a rational advertiser would have bid" had they had access to all of the information. *See* MSJ Reply at 7:5-15 (citing *Pulaski*, 802 F.3d at 989). Conversely, AMCO argues that Parducci paid premiums "even though he allegedly knew they were too high."

United States District Court
Northern District of California

*Id.* at 7:11-12.  It contends that there is "no single dollar amount establishing a definitive 'correct' replacement cost (or 'true value') of the home." *Id.* at 7:12-14.  As a result, it argues, Parducci has no evidence showing that any difference in premiums would directly address the allegedly unfair practice. *See id.* at 7:16-17.

AMCO overcomplicates the restitution that Parducci seeks.  He is simply asking for the difference between what he paid for the Coverage A limit following the 2013 inspection, and what would have been charged at the appraised value.  This follows the formula set forth in *Pulaski*: "the difference between what was paid and what a reasonable consumer would have paid at the time of purchase without the fraudulent or omitted information." *Pulaski*, 802 F.3d at 989.  This number can be calculated using the appraised value listed on the 2013 inspection.  Parducci's claim for restitution may proceed.

Because I find disputes of material fact regarding Parducci's UCL claim, and see no issue with the relief sought, summary judgment is DENIED for this claim.

**C.     INTENTIONAL AND NEGLIGENT MISREPRESENTATION**

To prove intentional misrepresentation under California law, a plaintiff must show: (1) a misrepresentation; (2) made with knowledge of its falsity; (3) with the intent to induce another's reliance on the misrepresentation; (4) actual and justifiable reliance; and (5) resulting damage. *Daniels v. Select Portfolio Serv'g Inc.*, 246 Cal. App. 4th 1150, 1166 (2016).  There is significant overlap between these elements and those required to show negligent misrepresentation.  The difference is in the second element.  Rather than knowledge of a misrepresentation's falsity, negligent misrepresentation requires "the absence of reasonable grounds for believing the misrepresentation to be true." *Id.*

**1.     MISREPRESENTATION**

AMCO contends that there is no evidence of any misrepresentation, "knowing or otherwise." MSJ at 18:21-22.  It again claims that Parducci "abandoned his fraudulent scheme theory" in favor of a "failure to inform theory," and that there is no evidence showing that the replacement cost values were inflated or inaccurate. *Id.* at 19:5-12.

Parducci points to two alleged misrepresentations in his grandparents' insurance policy.

1    First, he cites the statement that the Coverage A limit was "developed from models that use cost of

2    construction materials and labor rates for like homes in the area." MSJ Oppo. at 16:27-17:2

3    (citing Ex. 1 at AMCO-PAR000372). This, he argues, misrepresents AMCO's actual practice of

4    ignoring the appraised value—which is calculated using these models—and keeping the higher

5    replacement cost coverage amount. *Id.* at 17:3-7. In support, he cites testimony from an AMCO

6    representative and emails showing the inspection value and Coverage A limit of his grandparents'

7    house in 2013. *See id.*, Ex. 8 at 51:25-52:21; Ex. 12 at AMCO-PAR000458.

8        AMCO reads the policy differently. It argues that the statement that the Coverage A limit

9    was "developed from models that use the cost of construction materials and labor rates for like

10   homes in the area" is "not rendered untrue" if an inspection produces an estimated replacement

11   cost that is less than, or does not exactly match, the Coverage A limit. MSJ Reply at 8.

12       But this is a subjective reading of the language of the policy, as is Parducci's. If anything,

13   their arguments underscore the dispute of material fact—in this case, whether the policy

14   misrepresented how the coverage amount was derived—that is suited for jury resolution.

15       Parducci alleges a second misrepresentation by AMCO: that the insured had "exclusive

16   control over determining the replacement cost value." MSJ Oppo. at 18:15-16. He again points to

17   the language contained within his grandparents' insurance policy. *Id.*, Ex. 1 at AMCO-

18   PAR000372, AMCO-PAR000376. He also cites AMCO's practice of setting replacement

19   coverage at or above the reconstruction cost, as well as his purported inability to reduce his

20   coverage. *Id.*, Ex. 8 at 32:15-33:19, 54:18-55:11, 159:11-160:9; Ex. 18.

21       In response, AMCO argues that its policy never promises an insured "exclusive control"

22   over the Coverage A limit. MSJ Reply at 9:1-12. It acknowledges that the "Important Notice"

23   within the policy tells the insured: "You are responsible for selecting the appropriate amount of

24   coverage." *Id.* at 9:2-5 (citing MSJ, Ex. E at AMCO-PAR000008). What is key, it contends, is

25   the end of the sentence: "[y]ou may obtain an appraisal or contractor estimate, at your own

26   expense, which [AMCO] will consider and accept, if reasonable." *See id.*

27       This opens the door to at least two other disputes over material fact. First, the parties

28   disagree as to whether Parducci ever submitted another appraisal or contractor estimate. Next, it is

United States District Court
Northern District of California

1   unclear whether the estimates that Parducci obtained were in fact reasonable.  Both of these

2   questions should be answered by a jury.

### 2. RELIANCE

4        "Reliance exists when the misrepresentation or nondisclosure was an immediate cause of

5   the plaintiff's conduct which altered his or her legal relations, and when without such

6   misrepresentation or nondisclosure he or she would not, in all reasonable probability, have entered

7   into the contract or other transaction." *Alliance Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1239

8   (1995) (citations omitted).  "[J]ustifiable reliance is a fact-specific question that is usually

9   appropriate for jury resolution." *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 978

10  (N.D. Cal. 2018).  However, there may be the "rare case where the undisputed facts leave no room

11  for a reasonable difference of opinion." *See Alliance Mortg. Co.*, 10 Cal. 4th at 1239.

12       AMCO contends that this is that rare case, arguing that Parducci cannot prove justifiable

13  reliance because he continued to maintain coverage with AMCO even after learning of the alleged

14  fraud.  MSJ at 20:19-25.  It asserts that Parducci "did not take any action in 2016 even though

15  AMCO specifically notified the Parduccis with each renewal that the insureds 'are responsible for

16  selecting the appropriate amount of coverage;' and encouraged the Parduccis to 'obtain an

17  appraisal or contractor estimate." *Id*. at 20:22-25 (citing Ex. E at AMCO-PAR000008; Ex. F at

18  42:16-43:2, 44:2-7).  It points out that Parducci did not obtain Walker's estimate until 2017—and

19  even then, maintained the policy with AMCO until AMCO terminated it in October 2018.  *Id*. at

20  21:1-3 (citing Exs. H, Q).  By renewing the policy, AMCO argues, Parducci "admits that the

21  contested disclosure information had no effect on his actions."  MSJ Reply at 9:17-18.

22       Parducci rebuts AMCO's assertion that he "did not take any action in 2016" with familiar

23  evidence, including that he: (1) hired an attorney to review his grandparents' insurance policies;

24  (2) obtained the 2013 inspection report; (3) had measurements taken of the Parducci home; (4)

25  completed and shared with AMCO a replacement cost estimator; and (5) acquired Walker's

26  estimate.  MSJ Oppo. at 19:19-20:13 (citing in part Ex. 2 at 30:8-13; Ex. 15; Ex. 3 at 30:24-32:4;

27  Ex. 16; Ex. 17).  He also argues that wildfires in Northern California burning around the same

28  time made it "increasingly hard to obtain insurance coverage." *Id*. at 20:14 (citing in part Ex. 23

United States District Court
Northern District of California

at 45:21-46:3).

To the extent that the question of justifiable reliance hinges, as AMCO asserts, on any actions that Parducci took after 2016, there is clearly a dispute of material fact. While it is uncontested that Parducci maintained a policy with AMCO until 2018, he has proffered sufficient evidence showing that he took several steps toward changing that policy. Whether he was justified in relying on AMCO's purported misrepresentation while doing so is a fact-specific inquiry best left to the jury to decide.

### 3. DAMAGE

Finally, AMCO contends that there was no resulting damage because there is no evidence showing: (1) that AMCO overinsured the property, or (2) that the Parduccis would have otherwise paid lower premiums. MSJ at 21:18-22:5. I have already addressed the first point. And the second is not persuasive either.

While Parducci has not produced an exact amount of any lower premiums he might have otherwise paid, he offers sufficient evidence upon which a jury might find in his favor. Three pieces of evidence underscore a dispute of material fact as to whether the Parduccis would have paid less without AMCO's purported misrepresentation. First is Walker's lower estimate, which AMCO summarily disregards. MSJ Oppo., Ex. 19; *see* MSJ at 22:2-5 ("there is no evidence of a competing estimate."). Next is the "Important Notice" contained within AMCO's policy, which states: "Higher coverage limits may be selected and will result in higher premiums." *See* MSJ Oppo. at 21:24-27 (citing Ex. 1 at AMCO-PAR000372). Finally, Parducci points to the deposition of the AMCO representative, who testified that "Coverage A is one of those items that make up a premium." *See id.*, Ex. 8 at 88:10-11. Taken together, this evidence creates a reasonable factual inference that Parducci would have paid a lower premium had the Coverage A limit been lower. This is enough to survive summary judgment.

In sum, a genuine dispute of material fact exists as to the elements of Parducci's intentional and misrepresentation claims. Summary judgment is DENIED for these claims.

### D. FINANCIAL ELDER ABUSE

California law sets forth certain protections for elders, defined as any person residing in

23

California who is 65 years of age or older.  *See* Cal. Welf. & Inst. Code § 15610.27.  Financial abuse of an elder occurs when a person or entity "[t]akes, secretes, appropriates, obtains, or retains real or personal property of an elder . . . for a wrongful use or with intent to defraud, or both."  *Id*. § 15610.30(a)(1).  The "or" is important.  Intent to defraud is not required to support an elder abuse claim, nor is bad faith.  *Stebley v. Litton Loan Serv'g, LLP*, 202 Cal. App. 4th 522, 527 (2011).  "Wrongful use" arises when "the person or entity takes, secretes, appropriates, obtains, or retains the property and the person or entity knew or should have known that this conduct is likely to be harmful to the elder."  Cal. Welf. & Inst. Code § 15610.30(b).

AMCO contends that there is no evidence that it took any property from the Parduccis for a wrongful use or with intent to defraud.  MSJ at 22:13-18.  AMCO argues that it only received premiums from the couple, "which were used for a rightful purpose of paying for the coverage selected by the Parduccis."  *Id*. at 22:15-16.

Parducci responds that AMCO "'knew or should have known' that its conduct was likely to be harmful to the elderly."  MSJ Oppo. at 22:8-23.  He contends that AMCO "knew it had a policy in place to never lower replacement cost coverage even when a home was overinsured" and "knew that this policy would cause a large number of California homeowners, including the elderly Parduccis, to pay inflated premiums."  *Id*. at 22:15-19.  He further argues that AMCO "knew or should have known" that adjusting annually for interest "would cause a large number of homeowners, including elderly insureds, to pay inflated premiums."  *Id*. at 22:19-22.

Both parties' arguments are weak.  AMCO misstates the law, incorrectly asserting that intent to defraud is essential to an elder abuse claim.  *See* MSJ Reply at 10:6-8; *see also Stebley*, 202 Cal. App. 4th at 527 ("[I]ntent to defraud is no longer required in elder or dependent adult abuse cases.").  AMCO then contends that the Parduccis' insurance premiums were not collected for a wrongful use because the Parduccis "were insured for the coverage they purchased, and would have received the benefit of those benefits in the event of a loss."  MSJ Reply at 10:8-10.  This overlooks the statutory language stating that a wrongful use arises when a person or entity "*knew or should have known* that [their] conduct is likely to be harmful to the elder"—and offers no argument or evidence regarding what AMCO knew or should have known in exercising the

24

disputed practices or policies.  *See* Cal. Welf. & Inst. Code § 15610.30(b) (emphasis added).

Parducci attempts to offer some evidence showing that "AMCO knew it had a policy in place to never lower replacement cost coverage even when a home was overinsured . . . and knew that this policy would cause a large number of California homeowners, including the elderly Parduccis, to pay inflated premiums."  MSJ Oppo. at 22:15-19.  But the portions of the deposition that Parducci cites in support focus on the policy itself—they make no reference to the impact of that policy, let alone its impact on elderly people.  *See id*., Ex. 8 at 51:25-52:13.  The same is true for the other portions of the deposition that Parducci cites when attempting to support his second point about inflation.  *See id*. at 22:19-23 (citing Ex. 8 at 88:13-21, 94:21-95:22, 101:14-102:13).

While I must draw all reasonable factual inferences in favor of the non-movant when considering summary judgment, Parducci's evidence is not specific to an elder abuse claim.  There is no evidence that AMCO knew or should have known that its conduct was likely to harm elderly insureds; the cited deposition makes no mention of this category of customers.  I GRANT AMCO's motion for summary judgment on the elder abuse claim.

### E.      BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

"There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement."  *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1158 (9th Cir. 2002). Insurance policies are no exception.  *See id*.  Although the covenant is typically invoked in the insurance context when insurers are accused of denying coverage or mishandling a third-party claim, that is not the sole type of insurance claim to which it applies.  *See King v. Nat'l Gen. Ins. Co.*, 129 F. Supp. 3d 925, 940-41 (N.D. Cal. 2015) (holding that this is "one type of bad faith claim, but not the only type.").[10]  The terms and conditions of the insurance policy "define the duties and performance to which the insured is entitled."  *Kransco v. Am. Empire Surplus Lines Ins. Co.*, 23 Cal. 4th 390, 400 (2000) (citation omitted).

---

[10] AMCO argues that Parducci offers "no legal authority to support the proposition that a bad faith claim lies for actions of an insurer unrelated to a claim for benefits made under the policy."  MSJ Reply at 11:5-7.  *King* provides that, as discussed in my prior Order dispensing of this argument. *See* Order Denying Mots. to Dismiss ("Second MTD Order") [Dkt. No. 72] 15.

United States District Court
Northern District of California

AMCO notes that when I previously allowed this claim to proceed, it was based on Parducci's allegation that AMCO was "utilizing a replacement cost analysis that it knew or should have known was inaccurate, inflated or incorrect." MSJ at 22:27-23:2 (citing Second MTD Order at 15:21-22). It now contends that there is no evidence showing that the replacement cost values on the Parducci home were such. *Id*. at 23:3-6. It again points to the higher replacement cost value from 2018, along with Walker's testimony that replacement cost values are subjective and expected to vary, to dispute any inaccuracy of its own replacement cost value. *Id*. at 23.

In response, Parducci cites the same evidence supporting his UCL and misrepresentation claims. MSJ Oppo. at 22-23. He also reiterates his argument that AMCO represented that he was "in control of selecting the replacement cost value," which he contends frustrated his rights under the insurance agreement. *See id*. at 23:10-14.

To these points, I find the same disputes of material fact as described above. AMCO's motion for summary judgment is DENIED for this claim.

## F.     PUNITIVE DAMAGES

Finally, AMCO argues that Parducci's claim for punitive damages fails as a matter of law. California law permits punitive damages in actions "for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(a). Because the law permits punitive damages for fraud, because fraud is at the core of many of Parducci's allegations, and because there is a dispute of material fact as to whether that fraud occurred, this too belongs in front of a jury. AMCO's motion for summary judgment is DENIED on these grounds.

## III.    MOTIONS TO SEAL

Parducci filed two administrative motions to file under seal along with the above motions. Dkt. Nos. 139, 159.

There is a "strong presumption in favor of access" to court records. *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006). That presumption is rebutted under one of two standards, depending on whether the underlying motion at issue "is more than tangentially related to the merits of a case." *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1101

1   (9th Cir. 2016).  If so, the party seeking to seal the record must meet the "compelling reasons"

2   standard.  *Kamakana*, 447 F.3d at 1178-79.  If not, the party must meet a lower burden and show

3   "good cause."  *Id*. at 1180.

### A.  FIRST MOTION TO SEAL

5       Parducci's first motion to seal was filed with his motion for class certification.  Because

6   this motion is at most tangentially related to the underlying cause of action, the good cause

7   standard applies.  This requires a "particularized showing" that will "warrant preserving the

8   secrecy" of the materials.  *See Kamakana*, 447 F.3d at 1180.  Broad, unsubstantiated allegations of

9   harm are not enough.  *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992).

10       Parducci sought to seal portions of three exhibits, all of another exhibit, and an unredacted

11   version of his motion for class certification.  *See* Dkt. No. 139 at 1.  Although Parducci filed the

12   motion, the exhibits were previously designated as confidential by AMCO.  *See id*.  AMCO

13   narrowed the request to seal to portions of Exhibit 3 (the deposition of an AMCO official), all of

14   Exhibit 9 (a comparison of Overland surveys to AMCO renewals), and three portions of the

15   motion for class certification that cited these records.  *See* Dkt. No. 144 at 3.

16       AMCO argues that the portions of Exhibit 3 include information about internal business

17   procedures and processes, as well as standards and guidelines for underwriting risk and

18   acceptability that "distinguishes insurers in a competitive market and is therefore competition-

19   sensitive and confidential."  *Id*.  AMCO further contends that should this information become

20   public, it could suffer "substantial economic and competitive harm."  *Id*.  AMCO also notes that

21   Exhibit 9 contains confidential data regarding third parties.  *Id*.

22       The motion to seal is GRANTED with respect to Exhibit 9, which includes the names,

23   addresses, and individual policy information of insureds not involved in this suit.

24       However, I am not persuaded that the information contained within Exhibit 3 should be

25   sealed.  While it does appear to relate to AMCO's internal policy-writing process, AMCO has

26   only made general assertions that this information is "competition-sensitive" and that it would be

27   harmed by disclosure.  Merely asserting that a competitor would be unfairly advantaged by

28   disclosure, without explaining "how a competitor would use the information to obtain an unfair

United States District Court
Northern District of California

27

advantage" is not enough to satisfy the good cause standard. *See Dunbar v. Google, Inc.*, No. 5:12-CV-003305-LHK, 2012 WL 6202719, at *5 (N.D. Cal. Dec. 12, 2012). For example, much of the cited testimony discusses how inflation factors into AMCO's policy-writing process. *See* Ex. 3 at 95:2-96:2. AMCO has not articulated how its consideration or calculation of inflation distinguishes it from competitors, or how a competitor would use this information to obtain an unfair advantage over AMCO. AMCO has not made the requisite particularized showing of harm.

Because I see no need to seal the cited portions of Exhibit 3, I see no reason to seal the portions of the motion for class certification that reference the information disclosed. AMCO has also not shown a sufficient reason to seal the final excerpt of the motion (Lines 20:3-6).

This motion to seal is therefore GRANTED as to Exhibit 9, but otherwise DENIED.

## B. SECOND MOTION TO SEAL

Parducci's second motion to seal was filed with his opposition to AMCO's motion for summary judgment. Summary judgment is more than tangentially related to the merits of the case. Therefore, the parties must show a compelling reason why these materials should be sealed. Generally, such reasons exist when the judicial records "might have become a vehicle for improper purposes, such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." *Kamakana*, 447 F.3d at 1179.

Parducci sought to seal the entirety of two exhibits, excerpts of two others, and an unredacted version of his opposition to AMCO's motion for summary judgment. *See* Dkt. No. 159 at 2. Again, the exhibits at issue were designated as confidential by AMCO. *Id.* AMCO narrowed the request, seeking to seal three lines of the opposition and only the portions of the two exhibits.[11] *See* Dkt. No. 163 at 3.

This motion overlaps with the first motion to seal. Again, the parties seek to seal portions of the second deposition of the AMCO official (lodged here as Exhibit 8). The only difference is that the parties now seek to seal another page of testimony, which discusses similar information as

---

[11] Though no longer a party to this action, Overland also filed a brief supporting Parducci's request to seal the portions of Exhibit 9, which was filed as an administrative motion. To the extent that it should be construed as a motion, it is also DENIED for failing to articulate a compelling reason to seal the cited portions of the exhibit.

United States District Court
Northern District of California

1    described above.  *See id.*  The parties also request to seal portions of another deposition by the

2    same official (lodged as Exhibit 9) along with an exhibit submitted with that deposition (Exhibit

3    108), which discusses internal protocols when reviewing a replacement cost estimate.  *Id.*

4         This motion is DENIED for Exhibits 8 and 9, and the portions of the motion for summary

5    judgment, for the same reasons as above.  AMCO speaks only in generalities when arguing why

6    this information should be sealed: that it "distinguishes insurers in a competitive market" and that

7    AMCO "could suffer substantial economic and competitive harm" were it disclosed.  *See id.* at 2.

8    But AMCO does not draw a direct line between this specific information and how any competitors

9    would use it to gain an unfair advantage over AMCO.  *See Hodges v. Apple Inc.*, No. 13-CV-

10   01128-WHO, 2013 WL 6070408, at *2 (N.D. Cal. Nov. 18, 2013) (finding that an "unsupported

11   assertion of 'unfair advantage' to competitors" does not meet the compelling reasons standard).

12   Without more, the parties have not provided a compelling reason overcoming the strong

13   presumption of access to judicial records.

14        I will, however, GRANT the motion to seal Exhibit 108 filed with Exhibit 9, as it provides

15   more detailed, step-by-step instructions related to AMCO's internal procedures, guidelines, and

16   policy-writing process.

17        This Order references at least a portion of the material that the parties sought to seal,

18   specifically, a reference to inflation and a summary of the survey comparison in Exhibit 9.

19   Because the Order speaks about this generally, I see no reason to redact.  Should the parties

20   disagree or wish to seek reconsideration of my decision as to the motions to seal, they may file a

21   declaration explaining the specific grounds that would justify doing so.

**CONCLUSION**

23        For these reasons, Parducci's motion for class certification is DENIED.  AMCO's motion

24   for summary judgment is GRANTED on the elder abuse claim, but is otherwise DENIED.

25        A Case Management Conference is set for January 25, 2022 at 2 p.m.  The parties shall

26   submit a Joint Case Management Conference Statement on January 18, 2022 that contains, among

27

28

United States District Court
Northern District of California

other things, a proposed case and trial schedule.

**IT IS SO ORDERED.**

Dated: December 14, 2021

William H. Orrick
United States District Judge